UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

KAY FREUND,

              Plaintiff,

v.                                         Case No. 04-C-611

THE PURDUE PHARMA COMPANY, et al.,

              Defendants.

---

**DECISION AND ORDER**

---

      In this products liability action, plaintiff Kay Freund seeks damages for injuries she claims she sustained as a result of her addiction to a prescription pain medication called OxyContin, which is made by the Purdue Pharma Company (collectively "Purdue") defendants and marketed by the Abbott Lab defendants (collectively "Abbott"). Purdue and Abbott have moved for summary judgment on the ground, *inter alia*, that the action is barred by the applicable Illinois statute of limitations. For the reasons set forth herein, I agree and order the motions granted and the case dismissed.

**I. Background**

      OxyContin is the brand name of oxycodone hydrochloride, which is an opioid and a Schedule II controlled substance. In early 2001, plaintiff Kay Freund began taking OxyCodone when it was prescribed by her physician, Dr. David Richards, as treatment for Freund's extensive pain. Between February and July 2001, Freund appeared to experience only mild physical side-

effects such as "dry mouth," but she also experienced mental and emotional side-effects such as depression and irritability. (Cowles Aff., Ex. H at 4-5.) On July 21, she intentionally overdosed on OxyContin in an attempt to take her own life. She had earlier told her mother that she was becoming addicted to the drug and she told another doctor, who is retained as a plaintiff's expert in this case, that she overdosed because "the best way out of addiction was to kill myself." (Cowles Aff., Ex. H at 4.) After the overdose, Freund stopped taking OxyContin.

It is disputed whether Freund actually became addicted to the drug. Given the suicide attempt, Dr. Richards did not continue to prescribe the drug, but he did not believe she was actually addicted to it. She claims, however, that OxyContin "was the most important thing in my life and the center of my life" and that her addiction was so distressing to her that her only perceivable way out was suicide. (*Id*.) She remained off of OxyContin for some ten months.

In 2002, Freund was referred to Dr. Mazin Ellias, who in May prescribed OxyContin to treat Freund's pain. She claims she experienced the same symptoms during this course of treatment, *viz.* a feeling of being "stoned" and experiencing a buzz. For reasons unrelated to the drug, Freund soon switched doctors. Her new physician, Dr. Ahmet Dervish, eventually weaned her off the drug and prescribed other pain relievers. Freund has not taken OxyContin since December 2002.

On October 31, 2003, Freund brought the present lawsuit against Purdue, Abbott, and Mallinkrodt, Inc., a party that has since been voluntarily dismissed. The claims remaining against the first two defendants are based on theories of strict liability, negligence, malicious conduct, fraud, misrepresentation, and breach of the implied warranty of merchantability. While the claims are couched in several legal theories, they all involve the central claim that the defendants failed to adequately warn doctors and the plaintiff herself about the dangers of taking OxyContin.

2

**II. Analysis**

Freund's theory of liability is best summarized as follows:

she was not warned that she could become addicted to OxyContin. She was not warned that she might experience alternations of drowsiness and euphoria. Nor was she warned about withdrawal symptoms, or about the possibility that, if the OxyContin did not last 12 hours, she would experience such symptoms on a daily basis.

(Pltf. Br. in Opp. to Purdue at 8.) She makes similar claims about the warnings Purdue provided to physicians. As to defendant Abbott, the plaintiff claims that Abbott jointly marketed OxyContin with Purdue and coordinated promotional and marketing campaigns for the drug. The marketing jointly produced by Purdue and Abbott, the plaintiff claims, was misleading and failed to warn the plaintiff about the addiction risks of OxyContin.

The defendants raise Illinois' two-year statute of limitations as a defense.[1] They note that Freund knew in early 2001 that OxyContin was causing the very problems she complains about in this lawsuit. In July 2001 she attempted suicide because, in her own words, that was the only conceivable escape from the OxyContin addiction. Moreover, she was "unable to reduce or control her use of OxyContin due to a fear of withdrawal." (Cowles Aff., Ex. H at 4-5.)

Thus, in the defendants' view, Freund knew she was experiencing depression and addictive symptoms, and she knew that OxyContin was the cause, even to the extent that she attempted suicide to escape the problem. She knew this in July 2001. At that point, defendants claim, she was

---

[1] The parties agree that Illinois law governs this issue.

3

under an obligation to investigate the cause of her suffering. But because she did not file suit until October 2003–more than two years later–the statute of limitations should bar her claims.[2]

The plaintiff relies on the so-called "discovery rule," by virtue of which the statute of limitations is tolled until the injured person "knows or reasonably should know that he has been injured and that his injury was wrongfully caused." *Golla v. General Motors Corp.,* 657 N.E.2d 894, 898 (Ill. 1995); s*ee also Witherell v. Weimer,* 421 N.E.2d 869, 874 (Ill. 1981). In many instances, the time at which a plaintiff knows or reasonably should have known both of the injury and that it was wrongfully caused will be a disputed question of fact. *Witherell,* 421 N.E.2d at 874. Yet, "[w]here it is apparent from the undisputed facts that only one conclusion can be drawn, the question becomes one for the court." *Id.*

Because it is undisputed that Freund did not actually know that her injuries were wrongfully caused–that would require success in this very lawsuit, after all–the core question presented boils down to when she *should* have known that her injury was wrongfully caused. On one end of the spectrum, the answer could simply be that one should know when one is injured or in pain, because any level of suffering might rightly be deemed "wrongful." This would start the limitations period running as soon as the harm itself is discovered. On the other end of the knowledge spectrum, the limitations period could be tolled until the plaintiff learns about the specific nature of the wrongful conduct, whether that be negligence, fraud, or otherwise. Such a rule would toll the period essentially forever, or at least until a determination of liability was arrived at.

---

[2]The defendants note that Freund does have one claim not subject to the two-year statute of limitations, namely, the claim for implied warranty of merchantability. But they argue that claim cannot survive under Wisconsin law, and Freund does not present any argument to the contrary. Accordingly, that claim is dismissed.

4

Not surprisingly, courts have rejected both extremes. If the mere event of harm would always trigger the limitations period, unfairness would frequently result when substantial numbers of claims that have not factually ripened are precluded. Thus, in a dental malpractice case cited by the plaintiff, the limitations clock did *not* start ticking as soon as a dental patient experienced pain and bleeding. The dentist repeatedly tried to treat the condition over a period of years, reassuring the plaintiff all along the way that nothing was particularly unusual with her situation. The defendant in that case argued that the plaintiff's suffering of pain and bleeding was enough to commence the limitations period, but the court rejected that effort: "the defendant would have the court equate discomfort and dissatisfaction with knowledge that plaintiff suffered an injury at the hands of defendant." *Paske v. Green,* 491 N.E.2d 1195,1197 (Ill. App. Ct.1986). Instead, it was only when the plaintiff went to another dentist that she was able to infer the causal connection between the pain and her former dentist. At that point, once the plaintiff had made that connection, she knew that the injury could have been "wrongfully caused."

By the same token, courts have rejected the opposite extreme, which is the notion that a plaintiff must discover the controlling legal theory of liability before the limitations clock begins running. Such a rule, of course, would mean the statute of limitations would often begin running only after the plaintiff walks into a lawyer's office, a fact which would eviscerate the statute of limitations almost entirely. Thus, courts are clear that "wrongfully caused" is not a term of art and does not require the plaintiff to have "knowledge of negligent conduct or knowledge of the existence of a cause of action." *Knox College v. Celotex Corp.,* 430 N.E.2d 976, 980 (Ill. 1981). Instead, a person knows or reasonably should know an injury is "wrongfully caused" when he possesses "sufficient information concerning his injury and its cause to put a reasonable person on

5

inquiry to determine whether actionable conduct is involved." *Id.* At that point, "the burden then falls on plaintiff to investigate further as to the existence of a cause of action." *McIntyre v. Christ Hospital,* 536 N.E.2d 882, 885 (Ill. App. Ct. 1989).

Several cases have fleshed out these gradations of knowledge, with the controlling motif being whether, and at what point, the plaintiff is under a duty to investigate whether wrongful conduct might be the cause of her injury. The plaintiff relies largely on *Paske, supra,* and *McIntyre v. Christ Hospital,* 536 N.E.2d 882. Neither case supports her argument, however. In *Paske*, the dentist had convinced the plaintiff that everything was normal: the plaintiff

> thought that her gum problem "came with the bridgework," and "was something [she] just had to live with." For that reason, *she did not stop going to defendant* but continued her treatments because she thought defendant "was going to rectify [her gum problems]." She finally stopped going to defendant in 1978, after having acid treatments approximately every six months from 1974 to 1978, because she thought "what more could he do for me."

*Id.* at 1197 (italics added). The court concluded that the plaintiff had no reason to know that her injury was wrongfully caused until she got a second opinion from another dentist. Two related factors underlie the court's conclusion. First, in light of the dentist's continual reassurances, it would not have been fair to require the plaintiff to reasonably know that the dentist's own actions were the cause of her pain. Second, the plaintiff did not even stop going to that dentist for treatment until four years had passed, which corroborates the fact that there was no reasonable indication that the dentist had caused her injuries. In sum, because she reasonably believed her injuries "came with the bridgework," the plaintiff did not reasonably know that her dentist was the cause of her injuries until she met with another dentist.

6

*McIntyre,* the other case relied upon by the plaintiff, presents a similar situation. 536 N.E.2d 882. There, the plaintiff had undescended testicles that should have been discovered during a hernia operation he received fourteen years earlier. While he obviously knew at some point that his condition was unusual, he nevertheless received "repeated reassurances by his family doctor that everything was fine." *Id.* at 886. "Plaintiff was not concerned about his missing testicles because of reassurances from Dr. Krolikowski that 'Everything [was] fine,' and assumed the condition was 'a direct part and parcel' of the hernia surgery." *Id.* at 884. Thus, though he knew his condition was unusual, he had no reason to question whether it was wrongfully caused given the reassurances he received. *Id.* It was only when he underwent surgery at age twenty for a kidney stone that he was told of the problem by another doctor. In light of these facts, the court concluded that a jury could conclude the plaintiff was not reasonably placed on inquiry about his problem until this later examination revealed the fact that his problem should have been discovered by his former doctor.

Neither of these cases helps the plaintiff here. Both cases stand, first, for the principle that a tortfeasor should not be allowed to lull the patient into a false sense of comfort while the statute of limitations period runs out. Justice would not be done if courts allowed medical professionals to reassure their patients for a lengthy period of time and then claim that the statute of limitations barred their claims. Second, the cases both reflect the fact that both patients had no reason to know anything was unusual about their conditions. That is, they had no cause to believe that any injuries they had were wrongfully caused–indeed, they were persuaded to the contrary by the alleged tortfeasors themselves.

7

Moreover, the two cases differ because in each case another event occurred that concretely triggered the statute of limitations period. Specifically, in both cases the plaintiffs, who had been in the dark about the true nature of their medical conditions, later saw other medical professionals who discovered the problem and concluded that the cause was the earlier doctor or dentist. The two cases thus stand for the principle that plaintiffs who are not medical or dental experts are entitled to rely assurances given them by professionals; until told otherwise, neither plaintiff had any reason to know, or even suspect, wrongdoing. In contrast, here the plaintiff self-diagnosed her problem and took herself off the OxyContin voluntarily. At that point, she recognized both the injury and its cause, and she took appropriate action, facts which demonstrate that she was not relying on the advice of professionals. Thus, neither *McIntyre* nor *Paske* bears much similarity to the plaintiff's claims here.

Freund argues that her claim is not time barred because, despite knowing about the injury and its cause, the "wrongful" aspect of the injury was Purdue's failure to warn doctors about the risks involved in taking OxyContin. Of that, she argues, she had no knowledge. But to accept that argument would be to revert to the notion that a plaintiff must be aware of the precise legal theory underlying her case, an argument soundly rejected by courts: a plaintiff, it is clear, need not have "knowledge of negligent conduct or knowledge of the existence of a cause of action." *Knox College,* 430 N.E.2d at 980. Indeed, in almost any products liability action based on failure to warn the plaintiff could state that she had no knowledge of the warnings that were given; thus, to allow a plaintiff's ignorance about the product's warnings to postpone indefinitely the statute of limitations would make the statute a nullity.

8

Instead, the question in a case like this is when a plaintiff possesses "sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved." *Id.* It is clear that Freund was acutely aware of the problems she now complains of more than two years before she filed suit and, from her own testimony, it is equally clear that a reasonable person would have a duty to investigate whether there was wrongful activity. Prior even to her suicide attempt in July 2001, she stated that she likely told her mother about her problems. She told her "I was afraid that I was addicted to it because of how I felt if I, you know, took my next dose late, you know, I could immediately feel withdrawals, and I may have expressed that to her." (Cowles Aff., Ex. A at 191:12-22.) After the suicide attempt, she voluntarily took herself off the drug because, "now I'm afraid." ( Id. at 192:13-19.) She answered yes to the question at her deposition which asked, "after . . . you went to the hospital, you came back to consciousness and in that state you said to yourself, 'I'm going to stop taking this stuff?'" (Id. at 193:6-10.) Indeed, she told her own expert that the OxyContin was the cause of her suicide attempt, that she did not feel like herself while on the drug, and that "[t]he night I tried to commit suicide, I thought that this was no way to live, so the best way out of addiction was to try to kill myself." (Cowles Aff., Ex. H at 4.)

Based on these facts, I conclude that a reasonable person would have had a duty, by July 2001, to investigate the causes of her affliction and to determine whether they might involve wrongful conduct. Whereas the plaintiffs in *Paske* and *McIntyre* had medical professionals telling them everything was fine along the way, in this case Freund realized that the OxyContin was causing her problems and decided herself to stop using the drug. At that point, she recognized the dangers, yet she sat on her rights for more than two years.

9

Other considerations counsel that the plaintiff's claims are time-barred. Illinois has carved out an exception to the discovery rule when the injury is caused by a sudden traumatic event, such as a car accident or a stroke. *Golla,* 657 N.E.2d at 898-899. In *Golla,* the Illinois Supreme Court discussed an earlier product liability action involving birth control pills:

> In *Berry v. G.D. Searle & Co.,* 309 N.E.2d 550, 362 (Ill. 1974), the plaintiff filed a products liability action against the manufacturer and seller of birth control pills alleging that she had suffered a stroke as a result of the unreasonably dangerous nature of the pills. The plaintiff filed her action more than two years after her stroke occurred. . . . the court noted that "an action to recover for personal injuries resulting from a sudden traumatic event accrues when plaintiff first knew of his right to sue, i.e., at the time when the injury occurred." The court rejected the plaintiff's claim that her cause of action did not accrue until two years after the stroke occurred, when she discovered that the pills may have caused the stroke.

*Id.* (citations omitted.)

Picking up on that holding, the *Golla* court observed that "[t]he rationale supporting this rule is that the nature and circumstances surrounding the traumatic event are such that the injured party is thereby put on notice that actionable conduct might be involved." *Id.* at 899. The same considerations apply here. Just as the *Berry* plaintiff's stroke set the statute of limitations clock running, the suicide attempt in this case had similar effect. There is no reasonable alternative other than to conclude that the symptoms the plaintiff allegedly suffered, combined with her attempted suicide and her own voluntary cessation of the drug, constituted an event so traumatic and trenchant that she was under a duty to investigate the causes of that event. As the *Berry* court put it, "[f]rom plaintiff's description of the severity of her condition . . . it is inconceivable that her injury was not occasioned by a traumatic event and that she knew of this injury more than two years prior to the filing of her complaint." 309 N.E.2d at 559. *See also Curry v. A.H. Robbins Co.*, 775 F.2d 212, (7th Cir. 1985) (holding Illinois statute of limitations in products liability action ran from surgery

10

to remove allegedly defective IUD, as opposed to time plaintiff first learned of manufacturer's potential liability).

Purdue has filed copies of orders by United States district courts reaching essentially the same conclusion in two similar cases. In *McKnight v. The Purdue Pharma Company*, 2005 WL 3115276, Civ. A. No. 9:04-CV-116 (E.D. Tex. Nov. 21, 2005), the plaintiff had voluntarily taken herself off OxyContin on December 8, 2001 due to bad press the drug had received in the media, as well as her belief that the drug was too strong for her. (Supp. Cowles Aff., Ex. Q.) While on the drug, she slept too much, became irritable, heard voices, became addicted and "felt like a bad wife." (*Id.* at 7.) She filed suit against Purdue on December 24, 2003, some two years and sixteen days after ending her use of the drug. Ruling on the defendants' motion for summary judgment, the court concluded that when she voluntarily took herself off the drug on December 8, 2001, the statute of limitations began running. Applying *Witherell,* the court reasoned that "a person in these circumstances would be under an obligation to inquire further to determine whether an actionable wrong was committed." (*Id.*)

Likewise, in *Franz v. Purdue Pharma Co.*, No. 05-CV-201-PB (D. N.H. Feb. 22, 2006), the plaintiff was hospitalized for addiction to and withdrawal from OxyContin in October 2000, but did not file suit until April 2004. (Notice of Add'l Auth., Ex. X at 2-3.) Notwithstanding plaintiff's claim that she blamed herself for her addiction until April 2003 in part because her doctor told her OxyContin was safe and non-addictive when he prescribed it for her (*Id.* at 5), the district court concluded that her claims were barred under the Illinois two-year statute of limitations. Finding the Seventh Circuit's decision in *Curry v. A.H. Robbins* instructive, the court held that plaintiff should

11

have realized her injuries may have been caused by the defendants when she was hospitalized in October 2000.

Of course the facts in the present case created an even stronger duty to investigate, given the unequivocal event of Freund's attempt to commit suicide. And, just as the plaintiffs in the foregoing cases ended their own use of the drug, Freund weaned herself off OxyContin beginning in July 2001. At that point, "the burden then [fell] on plaintiff to investigate further as to the existence of a cause of action." *McIntyre,* 536 N.E.2d at 885.[3]

**III. Conclusion**

Because Freund did not file her lawsuit within two years of July 2001, the time at which she had a duty to investigate whether her injuries were wrongfully caused, her claims are barred by the statute of limitations. The motions for summary judgment are granted; all other motions are denied as moot, and the case is dismissed.

**SO ORDERED** this ___27th___ day of February, 2006.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

---

[3] To the extent Freund may have suffered injuries after resuming her OxyContin treatment–injuries which would fall within the limitations period–she does not make this distinction. Even if she did, however, her duty to investigate the cause of her injury still began in July 2001. Moreover, by the time she resumed taking OxyContin she was well aware of its addictive nature and how she felt while taking the drug; thus, any claim based on a failure to warn would fall flat.

12